## No. 12,945.

### FARMER *v.* THE PEOPLE.
(7 P. [2d] 947)

Decided February 1, 1932.

Mr. J. F. MEADOR, for plaintiff in error.

Mr. CLARENCE L. IRELAND, Attorney General, Mr. WALLACE S. PORTH, Assistant, for the people.

*En Banc.*

Mr. Justice Butler delivered the opinion of the court.

E. J. Farmer was charged with the murder of Earl Hopkins in Moffat county on January 6, 1931, and pleaded not guilty by reason of insanity. The jury found him guilty of murder in the first degree and fixed the penalty at death. He was sentenced accordingly, and he brings the case here, seeking the reversal of the judgment.

The assignments of error are that the court erred in refusing to give an instruction requested by the defendant, in giving a certain instruction, and in admitting certain evidence over the defendant's objection; and it is said that the evidence does not sustain the verdict.

In his brief, counsel for the defendant says: ''Counsel expresses the hope it is pardonable on his part to state frankly to the Court that, after a careful and sincere review of this record, he can find but one error in the whole proceeding. Such error is manifest * * * in the testimony of Assessor E. V. Haughey. * * * All of the instructions given in the case appear to have met the approval of the Court of Review at some time or other. In the case of Shank v. The People reported in 79 Colo. P. 576, instruction No. 14, which is criticised, appears to be in the exact wording as an instruction there given, and the same was given the approval of this Court.''

We commend counsel's frankness. In the ordinary case such a statement, made by counsel, would save us much labor. But in view of the serious consequences that would necessarily follow an affirmance of the judgment in this case, we made a painstaking examination of the entire record, to ascertain whether or not it discloses any error that, in our opinion, was prejudicial to the defendant.

1. The defendant resided on a ranch in Moffat county, having moved there in August, 1930. He had a dispute with Joe J. Jones over some hay on the ranch. The matter was arbitrated, but the defendant stated to the sheriff that, for his arbitrator, Jones picked a man who had been

working for him for four years, and "he treated me like a d—— dog." A day or two before the homicide the defendant instructed his wife to let him know if she saw "these fellows" coming for hay again, that he wanted to talk to them, referring to Jones and his assistant, who in fact was Hopkins, though Farmer did not then know his name. On the morning of the homicide the witness Campbell stopped at the ranch house to get warm. He testified that he heard the defendant's wife say to the defendant, "There goes your man; stop him"; and that the defendant said, "I will stop them." When Campbell left, the defendant was saddling his horse. In a few minutes thereafter Campbell heard three shots. The defendant's wife testified that what she said to the defendant was, "There goes the hayframe and the men after hay," and that the defendant said nothing. In this she was corroborated by one of their sons. After saddling his horse, the defendant, accompanied by his son-in-law, Renfro, rode to the haystack. The defendant took a rifle with him. Renfro, the only eyewitness to the homicide, gave this account of what followed their arrival at the haystack: The defendant dismounted and seated himself by the haystack, holding his rifle. Jones and Hopkins approached on a hayrack. The defendant asked Jones if he had authority for hauling the hay. Jones answered that he had, and drove into the haystack yard. The same question was repeated and the same answer given, whereupon the defendant shot and killed both Jones and Hopkins. When he was shot, Jones was on the rack, wrapping the lines around the line stake, his back being turned partly toward the defendant. Neither Jones nor Hopkins had a hayfork in his hands. The defendant went over to the bodies and applied a vile epithet to Jones. He then pitched some hay off the hayrack, remarking that, "It would look like he [Jones] was throwing hay off the rack when I shot him"; that it would have to be self-defense. The defendant, who then stood on the rack, threw the hayfork in the general direction

where he was standing when he shot. He then said to Renfro: "You know what you saw, and you know what to swear to. You seen Mr. Jones on the stack and saw him throw the fork, didn't you? I shot three times, and they thought I was bluffing." The defendant and the witness then returned to the house, and the defendant told the witness to stay there and keep his mouth shut.

The defendant's wife testified that the defendant entered the house, and, after staying a few minutes, left, saying that he was going to give himself up. Their son John testified that his mother asked the defendant what he had done, and the defendant answered that he had done "a plenty."

The defendant went to the school house at Axial, and said to the teacher that he had killed two men; that he wanted protection; that he wanted to surrender to the sheriff, and wanted the sheriff to take him in any direction but toward Craig, as he feared they would mob him. He said that he did not know what he was doing when he shot. The teacher said, "You are crazy," and the defendant said, "No, there is some crazy people in the family, though"; and he added that he was going to go crazy. He exclaimed, "My poor wife! There is no hopes for me now, a man having done what I have done." The sheriff, upon being notified, placed the defendant under arrest. The defendant told the sheriff that Jones and the other man (Hopkins) attacked him, and that forks were thrown at him.

2. Two physicians, testifying for the people, expressed the opinion that the defendant, when he committed the homicide, was sane. One of the doctors resided in Moffat county; the other, in Denver. Dr. Ebaugh, director of the State Psychopathic Hospital, in Denver, where the defendant was sent for observation, personally observed and examined the defendant during his stay there (about ten days), and from such observation and examination, together with such partial history of the defendant as he was able to obtain from the defendant him-

self, gave it as his opinion that the defendant was sane at that time and at the time the homicide was committed. The doctor also testified that, in his opinion, the defendant was malingering. He said that on one occasion, after the defendant had seen a patient who was reacting to visual and auditory hallucinations, the defendant, for the first time, told the witness that he (the defendant) was "hearing voices." The doctor considered this "a direct simulation of the other patient." The defendant attempted to escape from the hospital, and, when detected, attacked the attendant. Witnesses who had known the defendant for periods of time ranging from seven to thirteen years testified to his conduct and demeanor during that time, both before and after he was placed in jail, and stated that, in their opinion, he was sane.

The defendant's witnesses, all but one being members of his immediate family, testified to the defendant's conduct and demeanor prior to his arrest. The defendant's wife, daughter and sons testified that the defendant was odd; that on one occasion he got out of his automobile and rolled over two or three times, and said that it made him feel better; that he was opinionated and unreasonable and at times high-tempered; that he would cry occasionally when "mad"; that occasionally he exhibited fits of anger without any apparent cause; that he would talk irrationally at times; that he threatened to kill members of the family and commit suicide; that they did not think he was right in his mind; that they were afraid of him; and that at times they talked of having him examined to see what was the matter with him. His wife testified that his sister and three of her children "went crazy." The witness who was not a member of the family, testified that once, when witness was riding with the defendant, the defendant's automobile struck a cement abutment and "doubled up," and the defendant laughed about it; that on one occasion the defendant complained of his heart or head, and said that sometimes he did not know what he was doing, and expressed a fear that he was

losing his mind. The witness, however, said that at that time the defendant's conversation seemed rational, and the witness did not express an opinion that the defendant was insane. On rebuttal, Dr. Ebaugh, who heard all this testimony, said that nothing in the facts disclosed caused him to change his opinion that the defendant was sane.

There was testimony in behalf of the defendant, principally by members of his immediate family, concerning his conduct while in jail. The witnesses said that the defendant did not recognize members of his family; that when visitors called he would hide under the bed; that when his daughter called he paid no attention to her, but "went on acting up"; that once he "climbed up in the jail like a monkey"; that sometimes he would have his shirt "around him," and sometimes he would have no shirt on; that at times he would wring his hands and talk to himself; that he paced the floor all night and pulled his hair, sang, danced, laughed, prayed and cried; that at night he would roll over and tumble and knock the wall; and that on one occasion he said he was going to a show. One of the witnesses for the defendant, after testifying to the defendant's actions in jail, was asked whether the defendant's actions indicated insanity. He answered, "I thought if he wasn't insane, he sure had a pretty good alibi. We told the officials that we thought the defendant was crazy." Dr. Ebaugh heard all this evidence concerning the defendant's actions in jail, and testified, on rebuttal, that all the matters thus brought out were compatible with his opinion that the defendant was a malingerer, and did not change his opinion in that regard, or change his opinion that the defendant was sane. He gave reasons for his conclusions, but there is no necessity for repeating them here. His opinion that the defendant was malingering was fortified, to some extent, by the testimony of Long, the deputy sheriff. He said that he heard the defendant whispering, but not unless others were around and the defendant thought they

were looking; that the defendant got so he would not pay any attention to the witness, but if anybody came in with the witness, the defendant "would put on a show" for them; that is to say, he would throw all sorts of things, would grab a quilt and put it over his head, "or something like that." The witness also testified that on one occasion, when some plumbers left late at night after working at the jail, the witness turned out the light and slammed the door and then watched the defendant through a hole that the plumbers had made in the wall in the course of their work; that the defendant had been dancing around all afternoon with a quilt over his shoulders, and had bedding scattered all around; that after the witness slammed the door the defendant stood listening, and when he could not hear anything and thought everybody was gone, his appearance and actions changed; that he quit "acting up," took the quilt off and laid it on the opposite bunk, shook the dust out of his bedding, folded it up and "made his bed like anybody would."

3. It is said that the court erred in admitting, over the defendant's objection, evidence relating to an occurrence several years before the homicide. Haughey, a witness for the people, testified that in 1926 (about), at the Craig armory, he had occasion to witness the defendant's marksmanship; that the defendant shot and hit the target; that the witness complimented the defendant on being a good shot, whereupon the defendant, after boasting of his marksmanship, said that the officers had been over and "got his boys sometime before," and that if he had been home at the time, he did not believe those officers "would ever have got to the house." That evidence tended to show that the defendant possessed skill in the use of firearms, was proud of it, and was disposed to use firearms in enforcing or defending what he believed to be his rights, or in redressing his grievances, real or fancied. That the defendant's pride in his skill with firearms was as great after the homicide as it was before, is evidenced by the testimony of Dr. Ebaugh, who

said that the defendant, while in the hospital, said, in talking about deer-hunting, that he could knock a deer down so many yards away, a deer on a hill, just within his vision.

The trial court did not err in admitting the testimony of Haughey.

4. The instruction requested by the defendant was fully covered by an instruction given by the court on the same subject. The court, therefore, did not err in refusing to give the requested instruction.

5. We find that counsel for the defendant is correct in stating that the instruction to which objection was made in the assignment of errors is one that heretofore has been approved by this court. In giving it, the court did not err.

That the defendant killed Hopkins is undisputed. The jury found that, beyond any reasonable doubt, the defendant was sane when he committed the homicide, and that he was guilty of murder in the first degree. The verdict was supported by sufficient evidence and was approved by the trial court. That the trial was conducted fairly, that the defendant was ably defended, and that the trial court fully protected the defendant's rights, is attested by the record. Upon a careful examination of the entire record, we have been unable to find any error in the proceeding, and, therefore, we cannot sustain any of the assignments of error.

The judgment is affirmed. It is ordered that the judgment be executed during the week ending Saturday, the 19th day of March, 1932.